# In the United States Court of Federal Claims

## No. 10-726C
### (Filed: December 2, 2010)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
<br>    \*

**BONA FIDE CONGLOMERATE, INC.,**    \*

                \*        **Post-award Bid Protest;**

        **Plaintiff,**    \*        **Temporary Restraining Order;**

                \*        **Subject Matter Jurisdiction;**

        **v.**    \*        **Javits-Wagner-O'Day Act,**

                \*        **41 U.S.C. §§ 46-48c; Committee**

                \*        **for Purchase From People Who**

**THE UNITED STATES,**    \*        **Are Blind or Severely Disabled;**

                \*        **Bond.**

        **Defendant.**    \*

                \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

       <u>Michael J. Perez</u>, Perez & Wilson, LLP, 1420 Kettner Boulevard, Suite 600, San Diego, CA, for Plaintiff.

       <u>Kent C. Kiffner</u>, U.S. Department of Justice, 1100 L Street, NW, Washington, D.C., for Defendant.

---

### MEMORANDUM OPINION ENTERING TEMPORARY RESTRAINING ORDER
---

**<u>WILLIAMS</u>**, Judge.

       This post-award protest comes before the Court on Plaintiff's application for a temporary restraining order ("TRO") and on Defendant's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.[1]  This protest concerns

---

[1] This opinion memorializes an oral ruling issued on November 2, 2010.  This action was filed on October 26, 2010, and Plaintiff filed its motion for a temporary restraining order ("TRO") and/or preliminary injunction on that date.  The Court scheduled a hearing on Plaintiff's application for a TRO for October 28, 2010.  On that day – October 28 – Defendant moved to dismiss the protest for lack of jurisdiction and for failure to state a claim upon which

a procurement by the General Services Administration ("GSA") and the Committee for Purchase From People Who Are Blind or Severely Disabled (the "Committee") pursuant to the AbilityOne Program, formerly known as the Javits-Wagner-O'Day ("JWOD") Act, 41 U.S.C. §§ 46-48c.

Plaintiff alleges that NISH,[2] a non-federal agency employed by the Committee to distribute opportunities and select vendors, violated multiple procurement regulations in its consideration of proposals, and challenges the award of a contract to Opportunity Village, Inc. ("OVI") pursuant to Sources Sought Notice for Opportunity ("SSN") No. 10709 and Solicitation No. GS-09P-10-KS-D-0083. The SSN contemplated a contract to provide all management, supervision, labor, and equipment required to perform custodial and grounds maintenance services for two GSA buildings in Las Vegas, Nevada. The incumbent contract was set to expire on October 31, 2010, and OVI was to begin performing the newly awarded contract on November 1, 2010. However, in an effort to allow the Court time to fully consider the parties' arguments, Defendant voluntarily extended performance of the incumbent contract and deferred performance of the challenged contract until November 3, 2010.

Upon consideration of the record and the motion papers, the Court concludes that Plaintiff has demonstrated that it is likely that the Court has jurisdiction, and that Plaintiff has raised serious legal questions whether the Government, acting through GSA, the Committee for Purchase From People Who Are Blind or Severely Disabled, and NISH, committed a prejudicial violation of procurement law. Plaintiff will be irreparably harmed absent a temporary restraining order because contract performance by the awardee will commence on November 3, 2010, and Plaintiff may have been deprived of a fair opportunity to compete for the contract. The equities are balanced in favor of such relief. Defendant has been securing the needed services under a contract and a bridge purchase order with TTCC, Inc. ("TTCC") scheduled to expire on November 3, 2010. There is no impediment to the Government continuing to procure these services under a similar contractual vehicle during the period of this TRO. As such, there is little harm to the Government or third parties by preserving the status quo. The public interest will be served by allowing the protest process to proceed and by preserving a meaningful remedy in the event Plaintiff ultimately prevails. Because this protest is complex and involves a novel jurisdictional issue, this Court exercises its discretion to extend the TRO for an additional period beyond 14 days. See RCFC 65(b). As such, this TRO is effective until November 20, 2010.

---

relief can be granted. By agreement of the parties, the Court deferred hearing argument on the pending motion until November 1, 2010, and ruled orally on November 2, 2010.

[2] NISH was formerly an acronym for National Industries for the Severely Handicapped, but is now the entity's full name.

<u>**Findings of Fact**</u>[3]

**<u>The AbilityOne Program</u>**

The JWOD Act, now known as the "AbilityOne Program," provides employment opportunities for people who are blind or have other significant disabilities by promoting their access to and participation in federal contracts for goods and services. <u>See</u> Pub. L. No. 92-28, 85 Stat. 77 (1971), as amended, 41 U.S.C. §§ 46-48c. JWOD created an independent federal agency to promote government contracting with certain nonprofit agencies that employ individuals with disabilities. Specifically, JWOD established the Committee to facilitate the Government's "purchase of commodities and services from qualified nonprofit agencies." 41 C.F.R. § 51-1.1; <u>see</u> 41 U.S.C. § 46(a). A "qualified nonprofit agency" is an agency that employs individuals with severe disabilities "for not less than 75 per centum of the man-hours of direct labor required for the production or provision of the commodities or services." 41 U.S.C. § 48b(4). Plaintiff Bona Fide Conglomerate, Inc., a "qualified nonprofit agency" within the meaning of the statute, trains and enables individuals with disabilities to attain and maintain employment.

The Committee is an independent government activity with members appointed by the President of the United States. FAR 8.702.[4] The Committee determines which supplies and services government entities will purchase from AbilityOne participating nonprofit agencies. 41 U.S.C. § 47(a)(1); <u>see</u> FAR 8.702. Accordingly, the Committee maintains a Procurement List of all supplies and services that must be purchased from "any qualified nonprofit agency for the blind or by any qualified nonprofit agency for other severely handicapped." 41 U.S.C. § 47(a); <u>see</u> FAR 8.703. Once a good or service is added to the Procurement List, government entities – including executive agencies – are required to procure the good or service from a qualifying nonprofit agency ("NPA") at a price established by the Committee. 41 U.S.C. §§ 48, 48c; FAR 8.704.

The Committee has designated two central nonprofit agencies ("CNAs") to "represent" qualified nonprofit agencies serving people with severe disabilities other than blindness. 41 C.F.R. § 51-3.1. Both NISH and the National Industries for the Blind ("NIB") are CNAs

---

[3] At the time this decision was orally rendered, the Administrative Record had not yet been filed, but in order to rule on Plaintiff's application for a TRO, the Court <u>sua</u> <u>sponte</u> requested documents pertaining to the procurement. On October 29, 2010, Defendant filed the following documents: (1) Strategic Alliance between the Public Buildings Service, The Committee for Purchase From People Who Are Blind or Severely Disabled, and NISH; (2) a Letter from the Contracting Officer to NISH; (3) the Committee Determination of Suitability for Addition to Procurement List; (4) the Committee Notice of Addition to Procurement List; and (5) Contract No. GS-09P-10-KS-D-0083 between GSA and OVI. The findings of fact supporting the entry of this TRO are based upon these documents and the parties' filings and representations.

[4] The President appoints 15 members to the Committee – 11 government employees and four private citizens – for a five-year term. 41 U.S.C. § 46(a), (d).

designed to represent participating NPAs in dealing with the Committee under the Javits-Wagner-O'Day Act. Once an agency identifies a need for commodities or services, NISH or NIB is tasked with evaluating the qualifications and capabilities of qualifying nonprofit agencies and recommending an awardee to the Committee. 41 C.F.R. §§ 51-3.1 to -3.2. In essence, once GSA identifies a requirement for services on the Procurement List, the Central Nonprofit Agency designated by the Committee – here NISH – conducts an "order distribution process" that results in a government order for goods or services placed with a qualifying nonprofit agency.[5]

## The Three-Party Strategic Alliance Agreement Signed By GSA, The Committee, and NISH

In November of 2002, GSA, the Committee, and NISH entered into a Strategic Alliance Agreement (the "Agreement") to promote the employment of people with severe disabilities in providing certain services to federal agencies. Def.'s App. at A1. According to the Agreement, NISH would "represent[] Community Rehabilitation Programs" ("CRPs"). Id. The GSA Public Buildings Service ("PBS") agreed to give NISH CRPs the right of first refusal to perform custodial services, and to increase the share of work contracted through NISH in the future. NISH, in turn, agreed to develop a CRP certification process to promote high quality service and contract compliance and to reduce the amount of fees charged as the program grew. The Agreement tasked the Committee with "providing input and JWOD Program guidance that is consistent with the alliance's goals." Id. at A2. Finally, the Agreement memorialized the commitment of PBS, NISH, and the Committee to work together to pursue new business opportunities to add to the Procurement List.

## The Project History

Since 2000, GSA has obtained the subject custodial and ground maintenance services from a small business pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a). GSA intended to continue procuring the services under the 8(a) Program unless they were added to the Procurement List, in which case GSA would procure the services under JWOD's AbilityOne Program. 75 Fed. Reg. 39,497 (July 9, 2010). The incumbent contractor, TTCC, graduated from the 8(a) Program on December 12, 2005, rendering it ineligible to receive additional 8(a) contracts.

## The Sources Sought Notice

On October 14, 2009, NISH posted its SSN, requesting proposals for custodial and ground maintenance services. The SSN stated that the selected nonprofit agency would provide "all management, supervision, labor, and equipment, required to effectively, efficiently, and satisfactorily perform Custodial and Grounds Maintenance Services . . . for both GSA buildings in Las Vegas." Ex. B. The contract would be a performance-based contract that described required services in terms of desired results and associated quality standards. Def.'s App. at

---

[5] NISH and GSA entered into an agreement for a multi-year contract price adjustment methodology for pricing AbilityOne set-aside contracts placed on the Procurement List by the Committee, and this methodology was required to be incorporated into all AbilityOne contracts awarded by GSA's Region 9. Def.'s App. at A7-A8.

A37.   The SSN indicated that the dollar value of the contract for both buildings would total approximately $687,236.86 for the base year. Ex. B.[6]   GSA contemplated a period of performance of November 1, 2010, through October 31, 2015.

Section 4A of the SSN listed weighted "Project Allocation Criteria" as follows:

| Mark all that apply with "x" in left column.  Must comply with all mandatory requirements to be considered | | |
|---|---|---|
| | | Weight |
| X | Current with JWOD/NISH fees | Mandatory |
| X | Current registration as NISH Affiliate | Mandatory |
| X | Up-to-date information in NISH Capabilities Database | Mandatory |
| X | Capability and Capacity | 75% |
| X | Geography | |
| | Loss of JWOD business due to BRAC or other circumstances beyond NPA control | |
| X | What Customer Wants | 10% |
| X | Quality Control Systems | 15% |

Ex. B.

Section 4B, also entitled "Project Allocation Criteria," further required offerors to provide a Capability Statement relevant to the technical plan and the offeror's past experience and expertise, a brief description of the Quality Control and Quality Assurance program to be implemented, and the "organizational structure for Quality" to be used.  Id.   Section 4B concluded with the following statement regarding the offerors' geographic location:

**Geography**

[Community Rehabilitation Programs (CRPs)] will normally have priority for service opportunities in their geographic area, given that they have the potential capability, capacity and access to the fiscal resources to ensure a successful project operation.  When there is more than one interested CRP in the same area, the Region will make its choice based on the other criteria listed in the NISH Program Bulletin No. B-1.

Id.

---

[6]   On May 8, 2010, GSA's Contracting Officer wrote a letter to NISH estimating that the price would be $683,108.35 per year.  Def.'s App. at A4.  On July 9, 2010, the Committee Determination of Suitability for Addition to Procurement List reported that the "annual value" of the contract was approximately $735,068.25.  Id. at A5.

**Award to OVI**

On January 7, 2010, NISH notified Bona Fide that NISH had decided to award the project to OVI.  The notice explained that "[t]he local desire of the customer was truly the deciding factor in our final decision."  Compl. at 6-7.  In a telephonic debriefing held on January 11, 2010, a NISH official discussed the selection process with Bona Fide.  Both OVI and Bona Fide were deemed qualified under the Mandatory Requirements and "fully qualified" under the Capability and Capacity factor.  According to NISH, Bona Fide ranked higher than OVI under the "Quality Control Systems" factor, and OVI was preferred over Bona Fide with respect to the "What Customer Wants" factor.  Id. at 7.[7]

On March 8, 2010, GSA's Contracting Officer, Lousana Shew, notified NISH's Project Manager for GSA Contracts in the Western Region that GSA "has a requirement for a new contract for janitorial, grounds maintenance and related services at Lloyd George Federal Building and U.S. courthouse."  Def.'s App. at A4.  The letter requested that NISH "provide [its] written response by March 31, 2010, confirming which nonprofit agency will perform this requirement."  Id.

On July 9, 2010, the Committee issued its determination that OVI was suitable for addition to the Procurement List in the Federal Register, stating that OVI was "qualified to participate under the auspices of the AbilityOne Program."  Def.'s App. at A5-A6.  The corresponding Federal Register notice advised that interested persons could comment on the recommendation, but "[i]f the Committee approves the proposed additions, the entities of the Federal Government identified in this notice will be required to procure the products and services listed below from nonprofit agencies employing persons who are blind or have other severe disabilities."  75 Fed. Reg. 39,497 (Jul. 9, 2010).

A September 3, 2010, Federal Register notice officially added custodial and grounds maintenance services at the Alan Bible Federal Building and the Lloyd George U.S. Courthouse to the Procurement List, and designated OVI as the nonprofit agency to perform those services. 75 Fed. Reg. 54,114 (Sept. 3, 2010).  On September 7, 2010, the Committee sent GSA a "Notice of Change to the Procurement List," which informed GSA of the addition.  Def.'s App. at A10. GSA awarded contract number GS-09P-10-KS-D-0083 to Opportunity Village Association for Retarded Citizens on October 1, 2010, using Standard Form 1449.  Def.'s App. at A14.

Bona Fide appealed the decision under the procedures set forth in the AbilityOne Program Bulletin No. B-1.  Compl. at 9; see Ex. C at 7-8; Ex. F.[8]  After losing its initial appeal,

---

[7] Plaintiff challenges OVI's ranking under the "What Customer Wants" factor.  Though NISH apparently asserts that two customers at the GSA federal building preferred OVI, Plaintiff contends that the "customer" never indicated such a preference.  Pl.'s Mem. in Supp. of Pl.'s Mot. for TRO ("Pl.'s Mem. in Supp.") at 9.

[8] The B-1 Appeal Process allows a Community Rehabilitation Program ("CRP") such as Bona Fide to appeal NISH's decision within 10 business days of receipt of notice if the CRP

Bona Fide submitted a second appeal to the NISH Chief Operating Officer ("COO").  Ex. H; see Ex. G.  On August 9, 2010, Bona Fide was informed that NISH had upheld its decision to award the contract to OVI.  Ex. I.  In its opinion, NISH indicated that

> Confusion was generated by the fact that the region used weighted percentages for some of the criteria but did not include a percentage weighting for geography.  I believe that this is mitigated by the fact that the second page of the [SSN] clearly delineates geography as a key factor.

Id. at 4.  NISH's COO ultimately determined that "the project was distributed to OVI based upon the Sources Sought criteria."  Id.  The parties are currently engaged in discussions with NISH under the "A-2" appeal process,[9] but that process has not yet run its course.

**Discussion**

**Standards for Entering a TRO**

In deciding whether temporary injunctive relief should issue, a court considers: (1) whether the plaintiff is likely to succeed on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  No one factor is dispositive, and "the weakness of the showing of one factor may be overborne by the strength of others."  Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003) (quoting FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993)).  At the TRO phase of a bid protest, because the application must be resolved immediately, the record is necessarily truncated.

**Likelihood of Success on the Merits**

Defendant claims that Plaintiff has no likelihood of success on the merits because this Court lacks jurisdiction.  Defendant moved for dismissal on that ground on October 28, 2010, and also asserted that Plaintiff has failed to state a claim upon which relief can be granted.

### Jurisdiction

Defendant contends that because Plaintiff does not challenge any conduct on the part of GSA or the Committee directly, the Court does not have jurisdiction over Plaintiff's action.  The Court has jurisdiction over bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1).  In relevant part, the statute provides that the United States Court of Federal Claims

---

"feels that its proposal was not properly considered by NISH, or that its objection to a sole source assignment was not fairly considered."  Ex. C at 7.

[9] It appears that the "A-2 process" refers to the AbilityOne Program Bulletin No. A-2, entitled "Program and Grievance Resolutions for CRPs."

shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).

According to Defendant, Plaintiff's complaint challenges decisions made and actions taken by NISH, but "does not assert that any Federal official authority – indeed, any Federal official at all – engaged in any act that violated statute or regulation in this procurement." Def.'s Mot. to Dismiss at 8. During a telephonic hearing conducted on November 1, 2010, however, Plaintiff asserted that it challenged government action – including the Committee's adoption of NISH's recommendations – taken in connection with GSA's procurement.[10]

To the extent that Plaintiff challenges the actions of GSA working in concert with the Committee, this Court clearly has jurisdiction. When GSA "determined a need" for services for the Federal Government and the Committee listed those services on the Procurement List, a federal procurement was under way. See Distributed Solutions v. United States, 539 F.3d 1340, 1346 (Fed. Cir. 2008). The Federal Circuit has construed the term "procurement" broadly in addressing bid-protest jurisdiction granted by the Tucker Act, stating:

> [T]he phrase, "in connection with a procurement or proposed procurement," by definition involves a connection with any stage of the federal contracting acquisition process, including "the process for determining a need for property or services." To establish jurisdiction pursuant to this definition, the contractors must demonstrate that the government at least initiated a procurement, or initiated "the process for determining a need" for acquisition . . . .

Distributed Solutions, 539 F.3d at 1346 (emphasis added). Similarly, GSA and the Committee acted "in connection with a procurement or proposed procurement" when they engaged NISH and considered and adopted its recommendations. See id.; cf. Angelica Textile Servs., Inc. v. United States, No. 10-496C, 2010 WL 4227462 at *5 (Fed. Cl. Oct. 26, 2010) (the Committee's decision to place services on the list is "manifestly part of a procurement process for the laundry services and thus fall[s] within the jurisdictional ambit of 28 U.S.C. § 1491(b)(1)").

Although the AbilityOne Program employs a multi-step process that implicates several governmental and nongovernmental entities, the process of procuring the subject services is, at bottom, a government procurement resulting in the award of a contract by a federal agency. In essence, it appears that the AbilityOne Program works as follows: the Committee identifies a

---

[10] On November 2, 2010, just before the Court convened the telephonic conference to rule on the TRO application, Plaintiff amended its complaint to add the Committee and NISH as Defendants, and to request injunctive relief against GSA and the Committee. The request for relief in the amended complaint seeks a TRO "precluding the United States of America and GSA" from allowing work to continue.

federal contracting need for supplies or services and places that requirement on its Procurement List.  Once an agency's requirement is placed on the Procurement List, the agency must procure that requirement from a qualified nonprofit agency employing individuals with severe disabilities.  The Committee's designee, known as a "Central Nonprofit Agency" – here, NISH – is tasked by the Committee with evaluating qualifying nonprofit agencies and recommending an awardee to the Committee.  Although NISH is not a federal entity, it evaluates the individual nonprofit agencies at the behest of the Government and recommends an awardee to the Government.  If the Committee accepts NISH's recommendation and the agency enters into a contract with the named qualified nonprofit agency, the end result is a government contract – here, a contract between GSA and OVI.

The decision by GSA and the Committee to adopt NISH's recommendation is analogous to an agency's decision to implement a GAO recommendation to take corrective action.  The Federal Circuit explicitly recognized this Court's authority to review "a procurement agency's decision to follow the Comptroller General's recommendation" in Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989).  Similarly, this Court has jurisdiction to review agency action adopting a different type of procurement recommendation – the Committee and GSA's decisions to adopt NISH's recommendation.  As in the case of an agency following GAO's recommendation, the recommendation itself necessarily becomes the subject of judicial review because the Court must assess the rationality of the agency decision to adopt the recommendation.  As the Federal Circuit explained in Honeywell, the agency decision "was proper unless the Comptroller General's decision itself was irrational."  870 F.2d at 648.  Under this precedent, this Court must assess the rationality of the Committee and GSA's decision to adopt NISH's recommendation, and in so doing, evaluate the rationality of NISH's decision.  An agency is not justified in relying on an irrational decision.  SP Sys., Inc. v. United States, 86 Fed. Cl. 1, 14 (2009).

In that regard, it does not matter on whose recommendation the Government based its award decision – the Government's wholesale adoption of a third party's recommendation is itself a government action leading to award of a government contract.  Here, the Government – the Committee and GSA – accepted NISH's recommendation and appears to have made award to OVI without inquiring as to the reasoning behind NISH's decision and without knowledge of the evaluation or capabilities of any other offeror.  Although an analysis of the Government's adoption of NISH's recommendation necessarily entails an inquiry into the rationality of NISH's decision, that does not mean that NISH must displace the United States as the defendant.  The procurement action challenged here is GSA's award of a contract to OVI and the process leading up to that award.  The fact that the Government – GSA and the Committee – did not probe the basis for NISH's recommendation or the process NISH used to recommend the selection of OVI does not shield the Government's selection of OVI from judicial review.

In sum, based upon the truncated record and expedited briefing at this early stage of the litigation, the Court concludes that it is likely that this Court has jurisdiction over this action.

**The Merits of Plaintiff's Protest**

In a bid protest, the Court reviews the defendant's decision under the standards in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4).  The APA directs a reviewing court to overturn agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).  To prevail, the protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law.  Gentex, 58 Fed. Cl. at 648 (quoting Info. Tech. & Applications Corp. v. United States, 51 Fed. Cl. 340 (2001), aff'd, 316 F.3d 1312 (Fed. Cir. 2003)).  The protestor must show not only a significant error in the procurement process, but also that the error prejudiced it. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citing LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1556 (Fed. Cir. 1995)).

In considering whether to grant interim injunctive relief pending a final decision on the merits, the Court of Federal Claims has recognized that likelihood of success is a flexible factor. E.g., Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993) ("[I]t is not fatal to Magellan's effort to obtain interim relief . . . that it cannot demonstrate a 'significant' or 'strong' likelihood of success.").

Plaintiff seeks declaratory and injunctive relief on several grounds.  Plaintiff first argues that NISH's selection and recommendation of OVI were inconsistent with its stated evaluation scheme.   Under the SSN, an offeror's "Capability and Capacity" constituted 75% of its evaluation score.  Because Bona Fide and OVI were evaluated equally as "fully qualified" under this factor, the relative merit of their evaluations turned on the "Quality Control Systems" and "What Customer Wants" factors.   Bona Fide outperformed OVI under the 15% "Quality Control" factor such that Bona Fide's final evaluation score should have exceeded OVI's evaluation score.  While OVI purportedly prevailed under the "What Customer Wants" factor, that was only worth 10%.  Thus, because Bona Fide scored higher on the more heavily weighted factor, Bona Fide should have had a net advantage over OVI.   Notwithstanding Bona Fide's higher evaluation score, however, NISH recommended – and the Committee and GSA selected – OVI for award.

Plaintiff further challenges the determination that OVI prevailed under the "What Customer Wants" factor, arguing that contrary to the evaluation, two alleged GSA customers did not express a preference for OVI.  Because this allegation presents a factual dispute, the Court does not make any finding with respect to actual customer preferences at this time.  However, if this allegation proves to be true, Bona Fide would have had an even higher rating than OVI based upon the SSN factors.

Plaintiff also alleges that the Government misapplied the Geography factor.  Despite the SSN's indication that Geography was neither mandatory nor weighted, NISH allegedly afforded the criterion more weight than was due because OVI had administrative offices in Las Vegas, Nevada.  This allegation also raises a factual question that this Court cannot resolve at this juncture.  However, if the evidence demonstrates that the evaluation did not follow the SSN, this too would be a basis for Bona Fide to succeed on the merits.

Finally, Plaintiff argues that the integrity of the procurement process was compromised by conflicts of interest and favoritism.  Plaintiff alleges that before the SSN was issued, officials within NISH stated that they intended to award the contract to OVI, rendering the competition a sham.  In addition, Plaintiff suggests that OVI's Chief Executive Officer may have influenced the award decision because he also serves on NISH's board of directors.  These allegations present quintessential issues of fact which can best be resolved following deposition testimony or an evidentiary hearing.  But even without assessing the likely success of these allegations, Plaintiff has raised serious legal questions about the conduct of this procurement, in particular about the evaluation and ranking.  As such, this factor weighs in favor of temporary injunctive relief.

**Irreparable Harm**

Absent issuance of a temporary restraining order, Plaintiff would not have an adequate or effective remedy.  When analyzing irreparable injury, "[t]he relevant inquiry . . .  is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan, 27 Fed. Cl. at 447; see also Overstreet Elec. Co., Inc. v. United States, 47 Fed. Cl. 728, 744 (2000); Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 524 (1991) (stating that absent injunctive relief, "plaintiffs could recover only bid preparation costs, not lost profits, through an action at law").  Here, temporary injunctive relief is necessary to preserve the Court's ability to fashion meaningful relief.  Given the likelihood of success on the merits, it would be more disruptive to permit OVI to proceed than to temporarily enjoin performance and allow TTCC to continue working.  If OVI were permitted to perform the contract during the pendency of this protest but the Court ultimately were to rule in Plaintiff's favor, the relief ordered by the Court could substantially disrupt the Government, the parties, and the employees with severe disabilities.

Plaintiff will be irreparably harmed absent a temporary restraining order because contract performance by the awardee will commence tomorrow, and Plaintiff may be deprived of a fair opportunity to compete for and perform the contract.  Defendant has been securing the needed services under a contract and bridge purchase order with TTCC scheduled to expire on November 3, 2010.  There is no impediment to the Government continuing to procure these services under a similar contractual vehicle during the period of this TRO.  As such, there is little harm to the Government by temporarily preserving the status quo.

Defendant argues that Plaintiff's delay in seeking a TRO militates against finding irreparable harm and granting injunctive relief.  While a plaintiff's delay in seeking injunctive relief might impact a plaintiff's ability to demonstrate irreparable harm, that circumstance is not a factor here.  Defendant has not shown that Plaintiff slept on its rights or failed to apply for a TRO in timely fashion.  After the Committee finalized its decision to award the contract to OVI, Plaintiff actively engaged in NISH's appeal procedures and thought it prudent to allow the appeal process to proceed and perhaps avoid the need for litigation.  Under the circumstances, Plaintiff's limited delay was reasonable and does not preclude the Court from granting a TRO.

**Harm to Third Parties**

With respect to harm to third parties, the Court recognizes that individuals slated to work on this project – particularly the employees of OVI who have severe disabilities – will be harmed by not being able to perform the contract immediately.  However, these employees would also be harmed by any future disruption of the contract.  In balancing the harms, the Court determines that absent a TRO, there would be greater harm to Plaintiff than to other parties.

**Public Interest**

The public interest in preserving the integrity of the procurement system further weighs in favor of granting Plaintiff's application for a TRO.  There is an overriding public interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement regulations.  Gentex, 58 Fed. Cl. at 648; Cincom Sys. v. United States, 37 Fed. Cl. 266, 269 (1997) (citing Magellan, 27 Fed. Cl. at 448).  The public interest will be served by allowing the protest process to proceed and to preserve a meaningful remedy in the event that Plaintiff ultimately prevails.   On balance, the Court concludes that issuance of a temporary restraining order is warranted at this time.

**The Bond**

Rule 65(c) of the Rules of the Court of Federal Claims ("RCFC") requires that Plaintiff post a bond in the event a TRO or preliminary injunction is issued.  The rule provides, in relevant part:

> (c) Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

RCFC 65(c).  The purpose of posting security was explained in Allen M. Campbell Co. v. United States, 467 F.2d 931, 934 (Ct. Cl. 1972) (Nichols, J. concurring):

> [T]rial courts should make their interventions "circumspect and infrequent," in the Fifth Circuit's phrase.  Circumspection would include requiring an unsuccessful bidder, when plaintiff, to post security guaranteeing to make good any loss to any party that judicial interference may cause, if it is not ultimately upheld.  Courts that do not observe these precautions will sometimes leave wounds the Court of Claims will be in no position to heal.

Id. (internal citation omitted).

In the instant case, the "wounds" potentially inflicted on the Government by the improvident grant of a restraining order would entail costs incurred by OVI due to its inability to commence performing services.  Plaintiff suggested that costs to OVI would be minimal given that OVI has an office in Las Vegas and its staff is therefore already in place.  Accordingly,

12

Plaintiff proposed that the bond be set at $33,000.  However, Defendant estimated the cost for OVI to stand by to be approximately $2,000 per day for the period of the TRO.  In addition, Defendant estimated that administrative costs to GSA would likely range from $5,000 to $10,000, and requested that the bond be set at $50,000.

This Court is persuaded that there could be standby costs and administrative costs resulting from the order temporarily enjoining performance of OVI's contract.[11]  As such, the Court sets the bond at $50,000.

## Temporary Restraining Order

Upon consideration of the parties' arguments and the entire record herein, it is hereby **ORDERED** that:

1.      Defendant, United States of America, the General Services Administration, the Committee for Purchase From People Who Are Blind or Severely Disabled, and their officers, agents, servants, employees and representatives, including Contracting Officer Lousana Shew, and all persons acting in concert and participating with them respecting the subject procurement, be and they are hereby **TEMPORARILY RESTRAINED AND ENJOINED** from permitting performance of and/or performing the contract awarded to Opportunity Village, Inc. on October 1, 2010, under Source Selection No. 10709 and Solicitation No. GS-09P-10-K8-D-0083 for management, supervision, labor, and equipment required to perform Custodial and Grounds Maintenance Services for a period of 20 days.  Defendant may secure these services from the incumbent TTCC or any other legal source during this timeframe.

2.      Plaintiff shall post a bond in the amount of $50,000.00 in accordance with RCFC 65 and 65.1.  See RCFC 65(c), 65.1.  If the Plaintiff has any questions about the proper procedure for securing a bond, it may contact the Clerk's Office at (202) 357-6400.

Due to exigent circumstances, counsel for both parties are hereby **ORDERED** to provide immediate oral and written notice of the entry of this Temporary Restraining Order to any entities enjoined by virtue of this order and to TTCC to ensure that the services at issue may continue to be provided.

s/ Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[11]    Of course, at this juncture, this Court makes no finding that the Government would owe any costs to OVI in the event it is later determined that the TRO was improvidently granted.